STEVEN PARK (State Bar No. 215219)
spark@kslaw.com
KING & SPALDING LLP
333 S. Grand Avenue, Suite 4200
Los Angeles, CA  90071
Telephone:  (213) 443-4355
Facsimile:  (213) 443-4310

*see signature page for complete list of counsel.*

*Attorneys for Defendant*
STATE FARM MUTUAL
AUTOMOBILE INSURANCE COMPANY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| NETWORK SIGNATURES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>Defendant. | Case No.: SACV 11-00982-JVS (RNBx)<br><br>**STATE FARM'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  May 14, 2012<br>Time:  1:30 p.m.<br>Ctrm:  10-A<br>Judge:  Honorable James V. Selna<br><br>Date Action Filed:  June 30, 2011 |

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982- JVS (RNBx)

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

       Counter-Claimant,

  v.

NETWORK SIGNATURES, INC., a
California corporation,

       Counter-Defendant.

**TABLE OF CONTENTS**

Introduction .............................................................................. 1

I.  NRL Decided Not to Pay the Maintenance Fee
   and Intentionally Abandoned the '122 Patent ........................ 2

   A.  The '122 Patent Expired After NRL Did Not
     Pay the 7½ Year Maintenance Fee ............................ 2

   B.  NRL's Invention Evaluation Board Deliberately
     Decided Not to Pay the 7½ Year Maintenance Fee ................ 3

II.  After Network Signatures Expressed
   Commercial Interest, NRL Changed Its Prior
   Decision and Petitioned the PTO to Revive the '122 Patent ............ 4

   A.  The PTO May Revive a Patent if the Delay
     In Payment of the Maintenance Fee Was "Unintentional" ........ 4

   B.  The Definition of "Unintentional" Expressly
     Excludes a Deliberate Decision ............................ 5

C.  John Karasek's Petition Statement to the PTO
    Was False Because No 'Mistake of Fact"
    Was Made When NRL Deliberately Decided to Abandon ..................... 7

D.  Contrary to John Karasek's Unfounded Legal
    Assertion, It Makes No Difference Whether the
    Unknown Information Existed Prior to
    Expiration of the Patent.......................................................................... 9

E.  John Karasek's View of Law Eviscerates
    a Primary Purpose of Maintenance Fees .................................................. 12

III.  The '122 Patent Is Unenforceable Because
    John Karasek Intentionally Deceived the PTO
    by Misinterpreting the Law, Failing to Obtain and
    Identify Evidentiary Support, and Withholding Material Information ............. 12

A.  John Karasek's False "Unintentional" Statement
    Is Material Because But For the Statement the PTO
    Would Never Have Revived the '122 Patent ........................................... 14

B.  John Karasek Adopted a Specious "Mistake of Fact"
    Interpretation of the Law  so as to Deceive the PTO .............................. 14

C.  John Karasek Intended to Deceive by Filing
    a Petition Without Any Evidentiary Support for
    His Specious "Mistake of Fact" Interpretation ....................................... 17

D.  John Karasek Deceive the PTO by Failing to
    Identify the Evidentiary Support He Expected to
    Have After Reasonable Opportunity for Further Investigation .............. 19

E.  John Karasek Did Not Want Hazim Ansari to Sign
    A Declaration or Affidavit, Nor Did John Karasek Make
    Any Attempt to Obtain Corroborating Evidence of
    Hazim Ansari's Voice Mail or Emails Because He
    Knew Hazim Ansari's Statements Were Highly Suspect ...................... 20

F.  After John Karasek Obtained Evidentiary Support
    for His Specious "Mistake of Fact" Story, He Chose

ii

Not to Disclose the Evidence to the PTO and Instead
Drafted a Memorandum to His File ....................................................... 22

IV.  The '122 Patent Must Be Declared Unenforceable
To Do Justice To The PTO, The Patent System, And
All Of The 83 Defendants That Have Been Sued By Network Signatures ...... 22

V.  Conclusion............................................................................................... 23

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982-JVS (RNBx)

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Atofina v. Great Lakes Chem. Corp.*,
  441 F.3d 991 (Fed. Cir. 2006) .............................................................13

*Dura Operating Corp. v. Magna Int'l*,
  2011 WL 869372 (E.D.Mich. March 10, 2011) ............................14, 22

*Field Hybrids, LLC v. Toyota Motor Corp.*,
  2005 U.S. Dist. LEXIS 1159 (D. Minn. Jan. 27, 2005)........................7

*Figueroa v. U.S.*, 466 F.3d 1023, 1036 (Fed. Cir. 2006)...................2, 12

*In re Application of G*,
  11 U.S.P.Q. 2d (BNA) 1378 (Comm'r Pat. & T.M. 1989) ...........15, 16

*In re Maldague*,
  10 U.S.P.Q.2d (BNA) 1477 (Comm'r Pat. & T.M. 1988) ............15, 16

*In re Patent of Carlson*,
  2003 WL 25523657 (Comm'r Pat. Jan. 24, 2003) ......................passim

*In re Patent No. 5,181,974*,
  2007 WL 4974450 (Comm'r Pat. Aug. 17, 2007)............7, 11, 12, 16

*In re Patent No. 6,118,582*,
  2006 WL 4926249 (Comm'r Pat. June 13, 2006) ................................7

*In re Patent No. 6,785,519*,
  2009 WL 2903579 (Comm'r Pat. Sept. 1, 2009)..................................7

*Lawman Armor Corp. v. Simon*,
  2005 U.S. Dist. LEXIS 10843 (E.D. Mich. Mar. 29, 2005).............7, 23

*Rohm & Haas Co. v. Crystal Chem. Co.*,
  722 F.2d 1556 (Fed. Cir. 1983) ..........................................................14

*Therasense, Inc. v. Becton, Dickenson & Co.*,
  p. 15 (Fed. Cir. 2011)(en banc).....................................................13, 14

**STATUTES**

35 U.S.C. § 41(b) ...................................................................................2, 3

**OTHER AUTHORITIES**

37 C.F.R. § 1.378(a) ...................................................................................4

37 C.F.R. § 1.378 (c) ...................................................................................1

37 CFR 1.137 ...........................................................................................15

37 CFR 1.137(b) ...........................................................................5, 15, 17

37 CFR § 10.18 ...................................................................................passim

(37 CFR 1.378(c)) ("Petition") ...........................................................passim

Final Rule Notice, 62 Fed. Reg. 53132, 53158-59 (October 10, 1997) .................11

U.S. Patent No. 5,511,122...................................................................passim

MPEP § 711.03(c) ...............................................................................passim

MPEP § 2590(II) ...........................................................................................5

MPEP § 711.03(c), page 700-45...........................................................15

MPEP § 2500(II) .........................................................................................18

MPEP 700-144 .............................................................................................22

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982-JVS (RNBx)

**Introduction**

U.S. Patent No. 5,511,122 ("the '122 Patent") expired on April 23, 2004 after the Naval Research Laboratory ("NRL") determined the '122 Patent had no commercial value and decided not to pay the necessary maintenance fee to the U.S. Patent and Trademark Office ("PTO").  When Hazim Ansari, who later became a principal of Network Signatures, Inc., expressed a desire to exclusively license the '122 Patent, NRL petitioned the PTO under 37 C.F.R. § 1.378 (c) to revive the '122 Patent and claimed that NRL had "unintentionally" delayed payment of the maintenance fee for the '122 Patent.  However, rather than tell the whole story to the PTO in the petition, John Karasek, a staff patent attorney for NRL, merely stated, "the delay in payment of the maintenance fee to this patent was unintentional."  Based solely on the presumed truth of this statement, the PTO revived the '122 Patent.

Once a decision is made not to pay a maintenance fee, so as to allow a patent to expire, the patent holder may not later claim that the expiration was unintentional.  John Karasek later attempted to justify his statement in the petition to revive by arguing that NRL's decision to allow the patent to expire was based on a "mistake in fact," the mistake being that NRL was ignorant to attempts by Hazim Ansari to contact NRL before the '122 Patent expired.  However, "[t]he discovery of additional information after making a deliberate decision to withhold a timely action is not the 'mistake of fact' that might form the basis for acceptance of a maintenance fee."  *In re Patent of Carlson*, 2003 WL 25523657 at *6 (Comm'r Pat. Jan. 24, 2003).

Documents, records, and testimony clearly prove that NRL made a deliberate decision not to pay the maintenance fee.  Further evidence shows that, at the time he filed the petition, John Karasek had absolutely no reason to believe Hazim Ansari had tried to contact NRL before the expiration of the '122 Patent.  John Karasek created the evidence well after he had signed and filed his false assertion, all the while hiding the fact that the petition had already been filed and granted.  In total, the evidence proves that John

STATE FARM'S MSJ MEMORANDUM

1

CASE NO. SACV 11-00982-JVS (RNBx)

Karasek knew the PTO would not grant the petition if it was made aware of NRL's prior decision to abandon.  John Karasek chose to withhold this crucial information from the PTO, contrary to PTO practice rules.  The only reasonable conclusion is that John Karasek intended to deceive the PTO regarding NRL's prior decision to abandon the '122 Patent.

Network Signatures was fully aware that the '122 Patent had been improperly revived when it obtained its exclusive license and filed 83 meritless lawsuits designed to exploit the high costs of defense and extract nuisance value settlements.  In fact, before Network Signatures realized the '122 Patent had already been revived, it admitted there would only be a "slim chance" the PTO would grant the petition, but nonetheless encouraged NRL to improperly petition the PTO and claim the abandonment had been "unintentional."  For these reasons, Defendant State Farm respectfully requests the Court to grant the current motion and hold the '122 Patent unenforceable.

## I.     NRL Decided Not to Pay the Maintenance Fee and Intentionally Abandoned the '122 Patent.

Because there was no commercial interest in the '122 Patent, NRL decided not to pay the maintenance fee and allowed the '122 Patent to expire.

### A.     The '122 Patent Expired After NRL Did Not Pay the 7½ Year Maintenance Fee.

Maintenance fees are intended to force the patent holder to evaluate his or her patent and encourage the expiration of patents without commercial value.  *See Figueroa v. U.S.*, 466 F.3d 1023, 1036 (Fed. Cir. 2006) (Newman concurring).  A U.S. Patent has a 20-year term, but the patent holder must pay maintenance fees at 3½ years ($900), 7½ years ($2,300), and 11½ years ($3,800) to keep its patent alive.  35 U.S.C. § 41(b).  The maintenance fees may be paid during 6-month grace periods after each deadline, if a surcharge is also paid.  *Id.*  Failure to pay a maintenance fee within the grace period results in the patent becoming expired. *Id.*.

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982-JVS (RNBx)

The PTO issued the '122 Patent on April 23, 1996 (SOF-1) to the assignee of record, the United States of America, as represented by the Secretary of the Navy.  SOF-3.  NRL paid the 3½ year maintenance fee on July 23, 1999.  SOF-9.  The 7½ year maintenance fee was due on or before October 23, 2003 (SOF-10), but NRL did not pay the fee.  SOF-11.  The 6-month grace period for the 7½ year maintenance fee closed on April 23, 2004 (SOF-12), but NRL still had not paid the fee.  SOF-13.  On April 23, 2004, the '122 Patent expired.  SOF-14; 35 U.S.C. § 41(b).

**B.    NRL's Invention Evaluation Board Deliberately Decided Not to Pay the 7½ Year Maintenance Fee.**

NRL, acting through its Invention Evaluation Board ("IEB"), deliberately decided not to pay the 7½ year maintenance fee.  SOF-43, 44, and 45.  The IEB was responsible for making decisions about which patents to maintain.  SOF-30.  At the relevant time, John Karasek was NRL's associate counsel, intellectual property (SOF-18, 19, and 20) and Jane Kuhl was the head of NRL technology transfer office.  SOF-22, 26, and 28.  John Karasek and Jane Kuhl were members of the IEB.  SOF-31 and 32.  "Once or twice a year," the IEB discussed issued patents with upcoming maintenance fees due and made decisions whether to pay those fees.  SOF-34.

The IEB discussed the 7½ year maintenance fee for the '122 Patent at a regular meeting (SOF-42), and "a deliberate decision of the committee [was made] not to pay the maintenance fee for the '122 patent."  SOF-44.  An IEB maintenance fee review report has a handwritten "NO" noted for the '122 Patent under the "Pay Fee?" column.   SOF-46, Ex. B-6.  There was no mistake — neither John Karasek nor his office made any mistake in not paying the maintenance fee.  SOF-47 and 48.  Jane Kuhl noted in an official NRL memorandum, "there had been no commercial interest in the patent and the most recent maintenance fee was not paid to the USPTO and the patent was scheduled to be abandoned by NRL."  SOF-49.  The '122 Patent expired because NRL decided not to pay the maintenance fee.

**II.    After Network Signatures Expressed Commercial Interest, NRL Changed Its Prior Decision and Petitioned the PTO to Revive the '122 Patent.**

After the '122 Patent expired, NRL learned that Hazim Ansari[1] wanted an exclusive license, and in view of this new information, petitioned the PTO to revive the '122 Patent.  John Karasek of NRL filed a Petition to Accept Unintentionally Delayed Payment of Maintenance Fee in an Expired Patent (37 CFR 1.378(c)) (the "Petition") that affirmatively stated, "the delay in payment of the maintenance fee to this patent was unintentional."  SOF-75.  However, where a patent holder deliberately permits a patent to become abandoned (e.g., due to a conclusion that . . . <u>the invention lacks sufficient commercial value to justify continued prosecution</u>), the abandonment of such patent is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered "unintentional" within the meaning of 37 CFR 1.378(c).   Thus, John Karasek's statement was false as a matter of law.

**A.    The PTO May Revive a Patent if the Delay In Payment of the Maintenance Fee Was "Unintentional".**

The PTO may accept the payment of any maintenance fee due on an expired patent if, upon petition, the delay in payment of the maintenance fee is shown to the satisfaction of the PTO Director to have been "unavoidable" [2] or "unintentional."  37 C.F.R. § 1.378(a).  According to the Manual of Patent Examining Procedures (M.P.E.P.), while the PTO may require further information concerning the cause of abandonment, the PTO relies upon the applicant's duty of candor and good faith and accepts the statement that the entire delay in payment of a maintenance fee from the due date until the filing of a

---

[1] Mr. Hazim Ansari later became CEO of Metrix Services and is now a principal of Network Signatures, Inc.  SOF-50 and 51.

[2] Revival is permitted if the delay is "unavoidable."  However, this is an even higher standard to meet, and is not at issue here.

grantable petition pursuant to 37 CFR 1.137(b) was unintentional.[3]  MPEP § 711.03(c).
In accepting an "unintentional" statement, the PTO assumes the patent holder has upheld
its obligation under 37 CFR 10.18 to inquire into the underlying facts and circumstances.
*Id.*  Further, the PTO assumes the patent holder will not file an inappropriate statement
because to do so may render the patent unenforceable.  *Id.*  Thus, the PTO "is almost
always satisfied as to whether 'the entire delay was unintentional' on the basis of
statement(s) by the [patent holder] or representative explaining the cause of delay
(accompanied at most by copies of correspondence relevant to the period of delay)."  *Id.*

In the present case, the PTO granted NRL's Petition because it had no way of
knowing that John Karasek's statement was false.  John Karasek merely stated, "the
delay in payment of the maintenance fee to this patent was unintentional."  SOF-75.  No
other information concerning the factual basis or support for this statement was provided
to the PTO.  SOF-76.  Thus, the PTO simply accepted the statement because it was given
no information upon which to evaluate the truthfulness of the statement.

**B.     The Definition of "Unintentional" Expressly Excludes a Deliberate
Decision.**

John Karasek's bald statement, "the delay in payment of the maintenance fee to
this patent was unintentional," was false as a matter of law because an "intentional"
decision to abandoned a patent for lack of commercial value cannot be reversed under a
theory that the prior decision was "unintentional" when it is later discovered the patent
covers commercially valuable technology:

> Where the applicant deliberately permits an application to become
> abandoned (e.g., due to a conclusion that . . . the invention lacks sufficient
> commercial value to justify continued prosecution), the abandonment of

---

[3] While this M.P.E.P. section discusses patent applications, the section of the MPEP on
unintentional delay in payment of maintenance fees cites back to this section "for a
general discussion of the 'unintentional' delay standard."  MPEP § 2590(II).

such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered "unintentional" within the meaning of § 1.137(b) . . .   An intentional delay resulting from a deliberate course of action chosen by the applicant is not affected by:   (1) the correctness of the applicant's (or applicant's representative's) decision to abandon the application or not to seek or persist in seeking revival of the application; (2) the correctness or propriety of a rejection, or other objection, requirement, or decision by the [PTO]; or (3) <u>the discovery of new information or evidence, or other change in circumstances subsequent to the abandonment or decision not to seek or persist in seeking revival.</u>[4]

Changes to Patent Practice and Procedure; Final Rule Notice, 62 Fed. Reg. 53132, 53158-59 (October 10, 1997) (emphasis added).

The PTO has uniformly applied this reasoning to hold that expired patents were intentionally abandoned.  In *In re Patent of Carlson*, Petitioner filed to reinstate a lapsed patent because "it 'erroneously decided that there was no commercial need to pay the maintenance fee' [but] subsequently determined . . . that claims theretofore deemed commercially unimportant to [Petitioner], were in fact commercially important, and that, therefore, the maintenance fee should have been paid."  2003 WL 25523657 at *1 (Comm'r Pat. Jan. 24, 2003).  Petitioner argued it had made a "mistake in fact," in underestimating the patent's value, only realizing its worth when it found out that a competitor was offering a similar product, and "as such . . . the delay in payment was unintentional."  *Id.* at *2-3.  The PTO found otherwise.  "The discovery of additional information after making a deliberate decision to withhold a timely action is not the "mistake in fact" that might form the basis for acceptance of a maintenance fee . . ."  *Id.* at *6.

---

[4] The standard for "unintentional" delay is the same under 37 CFR 1.378 as it is for 37 CFR 1.137(b).  MPEP § 2590(II), citing § 711.03(c).

6

Similarly, in *In re Patent No. 4,496,886*, Petitioner argued its legal department had made a "mistake" in not keeping "the decision maker…informed as to the value of the…patent to [Petitioner] by way of a royalty-bearing license" due to "an administrative error." 1998 WL 35180901 at *1 (Comm'r Pat. Jul. 6, 1998). The PTO found that "to the extent that the legal department may have erred, the [PTO] must rely on the actions or inactions of duly authorized and voluntarily chosen representatives of the patent holder, and petitioner is bound by the consequences of those actions or inactions." *Id.* at *5. See also *In re Patent No. 5,181,974*, 2007 WL 4974450 (Comm'r Pat. Aug. 17, 2007) (no mistake of fact where petitioner's agent was unaware of a license agreement when deciding not to pay maintenance fee); *In re Patent No. 6,785,519*, 2009 WL 2903579 (Comm'r Pat. Sept. 1, 2009) (no mistake of fact where decision to pay maintenance fee was not communicated to petitioner's patent counsel); *In re Patent No. 6,118,582*, 2006 WL 4926249 (Comm'r Pat. June 13, 2006) (no mistake of fact where petitioner's agent erroneously believed patent was obsolete).

District Court cases have also considered and rejected similar assertions that a delay in payment was unintentional, noting that the pertinent inquiry is the patentee's intent regarding the *delay*, rather than the abandonment. "[R]enewed interest in an abandoned patent application only after the invention surfaces in the marketplace is the 'antithesis of an unintentional delay'". *Lawman Armor Corp. v. Simon*, 2005 U.S. Dist. LEXIS 10843 at *3-4 (E.D. Mich. Mar. 29, 2005). "[A] course of conduct resulting in delay that is purposefully chosen does not qualify as an unintentional delay." *Field Hybrids, LLC v. Toyota Motor Corp.*, 2005 U.S. Dist. LEXIS 1159, at *19-21 (D. Minn. Jan. 27, 2005).

**C.    John Karasek's Petition Statement to the PTO Was False Because No 'Mistake of Fact' Was Made When NRL Deliberately Decided to Abandon.**

John Karasek's bald statement, "the delay in payment of the maintenance fee to this patent was unintentional," was false as a matter of law, even if his version of the

STATE FARM'S MSJ MEMORANDUM                    CASE NO. SACV 11-00982-JVS (RNBx)

facts is accepted as true.  Several months after filing the petition to revive the '122 Patent, John Karasek drafted a memorandum that "documents the basis for [his] finding that NRL's late payment of the second maintenance fee for the subject patent was unintentional."  SOF-81.   John Karasek argued the delay was "unintentional" because:

> (1) "prior to expiration of the patent, Mr. Ansari had tried repeatedly to contact the TTO," but was unsuccessful in his attempts to advise NRL that his client was interested in licensing the '122 Patent (SOF-83); and

> (2)  "it is the routine practice at NRL to maintain in force any patent for which there has been a recent expression of interest.  In this instance, NRL would have paid the second maintenance fee for this patent, but for our ignorance of Mr. Ansari's efforts to contact NRL.  I find that this ignorance was a mistake of fact." SOF-84.

John Karasek does not dispute that NRL previously made a deliberate decision not to pay the 7½ year maintenance fee.  See Section I(B), supra.  Rather, John Karasek's position is that NRL "unintentionally" abandoned the '122 Patent solely because it was ignorant of Hazim Ansari's pre-expiration attempts to contact NRL.

John Karasek is wrong.  "The discovery of additional information after making a deliberate decision to withhold a timely action is not the 'mistake in fact' that might form the basis for acceptance of a maintenance fee." *In re Patent of Carlson*, 2003 WL 25523657 at *6 (Comm'r Pat. Jan. 24, 2003).  In *In re Patent of Carlson*, the petitioner, InterMetro, had an Intellectual Property Committee that tasked Mr. Welsch with the review of InterMetro's more than 110 then-unexpired patent families to decide whether to pay maintenance fees. *Id.* at *3.   Mr. Welsch reviewed the patent and recommended not to pay the 3½ year maintenance fee. *Id.*  Mr. Welsch, subsequent to the expiration of the patent, learned that a competitor of InterMetro was offering a product of the type disclosed in the subject patent. *Id.* at *4.   Thereafter, Mr. Welsch again carefully studied the subject patent and discovered information he had missed in his first review -

8

specifically, that Claims 15-29 relate to different embodiments than Claims 1-14.  *Id.*
Mr. Welsch then determined that the patent was commercially important and that the
maintenance fee should have been paid.  *Id.*  Petitioner, InterMetro, asserted that if Mr.
Welsch had been aware that the patent covered multiple embodiments, Mr. Welsch would
have paid the maintenance fee.  *Id.* at *6.  However, the PTO ruled, the discovery of
additional, other information was simply a change in circumstances that occurred
subsequent to the expiration of the patent (*Id.* at *6), and rejected the petition to revive.
*Id.* at *7.

Similarly, John Karasek was the record-keeper of NRL's Invention Evaluation
Board ("IEB") (SOF-30, 36, and 37), which was responsible to make decisions whether
to pay maintenance fees.  SOF-30.  There was "a deliberate decision of the [IEB]
committee not to pay the maintenance fee for the '122 patent."  SOF-43, 44, 45, and 46.
John Karasek, subsequent to the expiration of the '122 Patent, learned that Mr. Ansari's
client was interested in taking an exclusive license.  John Karasek then determined that
the '122 Patent was commercially important and that the maintenance fee should have
been paid.  SOF-65.  Just like InterMetro, John Karasek states that "NRL would have
paid the second maintenance fee for the '122 Patent, but for our ignorance of Mr.
Ansari's efforts to contact NRL."  SOF-84.  However, just as in the *In re Patent of
Carlson* case, the discovery of interest by Mr. Ansari's client was simply a change in
circumstances that occurred subsequent to the expiration of the '122 Patent.  *In re
Carlson*, at *6.  John Karasek's statement, "the delay in payment of the maintenance fee
to this patent was unintentional," was false as a matter of law.

### D.  Contrary to John Karasek's Unfounded Legal Assertion, It Makes No Difference Whether the Unknown Information Existed Prior to Expiration of the Patent.

John Karasek had no legitimate basis to rely on pre-expiration attempts by Hazim
Ansari to conclude that there had been a "mistake of fact" when NRL decided to abandon

STATE FARM'S MSJ MEMORANDUM                    CASE NO. SACV 11-00982-JVS (RNBx)

the '122 Patent.  In *In re Patent of Carlson*, Mr. Welch claimed he had been ignorant to the scope of Claims 15-29, in particular, that Claims 15-29 covered different embodiments than Claims 1-14.  Certainly, the unknown information existed prior to expiration because claims 15-29 were in the patent.  Similarly, John Karasek argues the unknown information existed prior to expiration of the '122 Patent because Hazim Ansari is alleged to have attempted to contact NRL prior to expiration.  SOF-83  However, *In re Patent of Carlson* holds that it does not matter whether unknown information existed prior to expiration and that discovery of the unknown information after expiration is simply a change in circumstances.

> The discovery of additional information after making a deliberate decision to withhold a timely action is not the "mistake in fact" that might form the basis for acceptance of a maintenance fee . . .  The discovery of additional, other information is simply a change in circumstances that occurred subsequent to the expiration of the patent.  <u>That [Petitioner] discovered such additional, other information subsequent to the expiration of this patent</u> does not cause the delay resulting from [Petitioner]'s previous deliberate decision to become "unintentional." . . . Petitioner contends that the instant petition is based upon a mistake of fact and not a change of mind after reviewing the facts a second time.  Nevertheless, the latter condition is precisely the situation herein.  The record reveals that [Petitioner] reviewed the patent and decided not to pay the maintenance fee.  Petitioner now seeks to revisit [its] decision . . . and comes to the opposite conclusion - the maintenance fee should have been paid.  Petitioner overlooks the salient fact that the entire delay . . . results from a conscious and deliberate decision . . . [and] cannot now be regarded as unintentional . . . .  Obviously, [Petitioner] now wishes that [it] had given the instructions to pay the maintenance fee.  Nevertheless, what [Petitioner] now wishes or intends and what [it] would "have wished or

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982-JVS (RNBx)

intended had [it] been aware of the commercial importance of the subject patent," are both immaterial.  The salient point is: there is no adequate showing that, when the maintenance fee payment for the above-identified patent was due, [Petitioner] intended that the payment be made, such that the patent would continue in force.  Rather, [Petitioner] intentionally withheld payment of the maintenance fee.  [Petitioner] intended that the patent expire.  As such, it is antithetical to the meaning of "unintentional," to now accept the maintenance fee and reinstate the patent.

*Id.* at *6 (emphasis added).

The case of *In re Patent No. 5,181,974*, 2007 WL 4974450 (Comm'r Pat. Aug. 17, 2007) similarly holds that unknown information existing prior to expiration of the patent cannot be a basis for "unintentional" delay.  In this case, a decision was made not to pay the 11½ year maintenance fee.  *Id.* at *1.  After the patent expired, it was discovered that the person who made the decision to abandon the patent had failed to consider that the patent was subject to a licensing agreement or contract.  *Id.* at *1.  Clearly, the licensing agreement or contract existed prior to expiration of the patent.  Notwithstanding, petitioners asserted, "if it were known to [the decision maker] that the instant patent was subject to a contract or licensing agreement at the time he made the decision not to pay the maintenance fee, he would not have permitted the expiration of the patent."  *Id.* at *2.  The PTO applied the reasoning of *In re Patent of Carlson* to deny the petition to revive.  *Id.* at *5.

Thus, it does not matter that NRL made its decision to abandon the '122 Patent without the benefit of knowing of Hazim Ansari's alleged attempts to contact NRL.  John Karasek may have wished he had been aware of Hazim Ansari's attempts to contact NRL, but such wish is immaterial.  Just as in *In re Patent of Carlson*, NRL made "a deliberate decision . . . not to pay the maintenance fee for the '122 patent."  SOF-43, 44, 45, and 49.  Thus, because it was antithetical to the meaning of "unintentional" for John

Karasek to state, "the delay in payment of the maintenance fee to this patent was unintentional," the statement was false as a matter of law.

### E.     John Karasek's Unfounded Legal Assertion Eviscerates a Primary Purpose of Maintenance Fees.

Maintenance fees induce patent holders to evaluate their patents at the 3½, 7½ and 11½ year points, and if they have failed to achieve commercial value, to relinquish the "limited monopoly" of their patents to the public domain.  *See Figueroa v. U.S.*, 466 F.3d at 1036.  Under John Karasek's unfounded view of the law, a patent holder could decide not to pay a maintenance fee and then wait to see if infringers come to light.  Only if the patent holder learns of an infringement within the two-year limit for claiming unintentional abandonment, would the patent holder continue to invest in the patent by paying the maintenance fee.  John Karasek's view of the law would allow the patent holder to revive the patent as "unintentionally" abandoned, so long as the infringement started before expiration of the patent.  However, under a correct interpretation of the law, it does not matter whether the infringement started before expiration or after.  *See In re Patent of Carlson*, 2003 WL 25523657 at *6 (Comm'r Pat. Jan. 24, 2003) (unknown claims existed prior to expiration); *In re Patent No. 5,181,974*, 2007 WL 4974450 at *5 (Comm'r Pat. Aug. 17, 2007) (unknown license existed prior to expiration).

### III.   The '122 Patent Is Unenforceable Because John Karasek Intentionally Deceived the PTO by Misinterpreting the Law, Failing to Obtain and Identify Evidentiary Support, and Withholding Material Information.

If the PTO had known what John Karasek knew, the PTO would never have revived the '122 Patent.  Because John Karasek intentionally deceived the PTO, the '122 Patent must be declared unenforceable.  Specifically, John Karasek deceived the PTO by: (1)  ignoring M.P.E.P practice guidelines, PTO decisions, and case law to hold that a deliberate decision not to pay a maintenance fee, made without consideration of unknown pre-expiration information, is a "mistake of fact" that renders the delay in payment

12

"unintentional;" (2) failing to possess evidentiary support of Hazim Ansari's prior attempts to contact NRL and/or failing to identify evidence of Hazim Ansari's prior attempts to contact NRL as likely to be obtained after a reasonable opportunity for further investigation as required under 37 CFR § 10.18; and (3)  withholding NRL's decision to abandon and Hazim Ansari's intent to litigate from the PTO, with full knowledge that his petition would be denied if this information were disclosed.  While any one of these actions leads to only one possible inference, that John Karasek intended to deceive the PTO, the cumulative evidence leaves no doubt.

"Inequitable Conduct is an equitable defense to patent infringement that, proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickenson & Co.*, p. 15 (Fed. Cir. 2011)(en banc).  The doctrine of inequitable conduct applies to instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim and renders the entire patent unenforceable.  *Id.* at 28.  "A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 1001 (Fed. Cir. 2006)(*quoting Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006)).  To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO.  *Therasense* at p. 19, *citing Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).  "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* at 25, *citing Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1340 (Fed. Cir. 2009).  To meet the clear and convincing evidence standard, "the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence." *Id.*, *citing Star*, 537 F.3d at 1366.  In the context of a petition to revive a patent based on an "unintentional" delay in

payment of a maintenance fee, deceptive intent may reasonably be inferred when a petitioner intentionally fails to disclose to the PTO that a prior decision had been made to abandon. *Dura Operating Corp. v. Magna Int'l*, 2011 WL 869372 at \*12 (E.D.Mich. March 10, 2011).

**A.   John Karasek's False "Unintentional" Statement Is Material Because But-For the Statement the PTO Would Never Have Revived the '122 Patent.**

"Although but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct, [the Supreme Court] recognizes an exception in cases of affirmative egregious misconduct." *Therasense*, p. 29.  When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material. *Id.*, *citing with approval Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) ("there is no room to argue that submission of false affidavits is not material").  John Karasek's "unintentional" statement is undeniably material because it is an unmistakably false affidavit.  Evidence of a decision not to pay a maintenance fee is material because "a reasonable USPTO patent examiner" would not revive a patent if the failure to pay the maintenance fee was intentional. *Dura Operating Corp. v. Magna Int'l*, 2011 WL 869372 at \*11 (E.D. Mich. March 10, 2011).  The PTO granted the Petition and revived the '122 Patent based on John Karasek's false "unintentional" statement, without any evidence of NRL's decision to abandon being provided.  SOF-75, 76, 79, and 80.  Thus, but-for the false statement, the Petition would not have been granted and the '122 Patent would not have been revived.

**B.   John Karasek Adopted a Specious "Mistake of Fact" Interpretation of the Law so as to Deceive the PTO.**

In view of legal research conducted on May 10, 2004, John Karasek asserted that if "new facts" existed of which NRL was ignorant when it decided to abandon the '122 Patent, he could claim a "mistake of fact."  On May 10, 2004, after he discovered that the

STATE FARM'S MSJ MEMORANDUM                    CASE NO. SACV 11-00982-JVS (RNBx)

'122 Patent had already expired, John Karasek asked George Legg and John Mills from his office to conduct legal research to determine whether a petition to revive could be supported.  SOF-70 and 85.  George Legg and John Mills orally reported the results of their research to John Karasek.  SOF-71 and 85.  John Karasek attached several printed copies of cases and regulations to his July memorandum. SOF-86.  The legal research included:  (1)  PTO Procedures, pages 11-137 and 11-138; (2) M.P.E.P., pages 700-145 and 700-146; (3) *In re Maldague*, 10 U.S.P.Q.2d (BNA) 1477, 1478 (Comm'r Pat. & T.M. 1988); and (4) *In re Application of G*, 11 U.S.P.Q. 2d (BNA) 1378, 1380 (Comm'r Pat. & T.M. 1989).  SOF-86.  Based on this research, John Karasek found that NRL's ignorance of Hazim Ansari's efforts to contact NRL was a "mistake of fact" that "is a sufficient basis for finding that NRL's failure to pay the second maintenance fee for this patent on time was unintentional."  SOF-85, quoting memo.

Rather than support John Karasek's interpretation of the law, this legal research expressly teaches the opposite.  Under a heading "Unintentional Delay," the first copied page of the M.P.E.P. states, "[a] delay resulting from a deliberately chosen course of action on the part of the applicant is not an 'unintentional' delay within the meaning of 37 CFR 1.137."  MPEP § 711.03(c), page 700-45.  Further, the same M.P.E.P. page expressly cites *In re Application of G* to further define "unintentional."

> Where the applicant deliberately permits an application to become abandoned (e.g., due to a conclusion that the claims are unpatentable, that a rejection in an Office action cannot be overcome, or that the invention lacks sufficient commercial value to justify continued prosecution), the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as 'unintentional' within the meaning of 37 CFR 1.137(b).[5]

---

[5] The standard for "unintentional" delay is the same under 37 CFR 1.378 as it is for 37 CFR 1.137(b).  MPEP § 2590(II), citing § 711.03(c).

*Id.*  Even if John Karasek hoped to distinguish *In re Application of G* as forbidding changing one's mind "due to applicant's misjudgment that there was nothing patentable," nothing in the case authorizes NRL to change its mind after discovering previously unknown facts.  The M.P.E.P further cites *In re Maldague* for the proposition that "[a]n intentional course of action is not rendered unintentional when, upon reconsideration, the applicant changes his or her mind as to the course of action that should have been taken." *Id.*  Even if John Karasek hoped to distinguish *In re Maldague* as forbidding "the arrival at a different conclusion after reviewing the same facts a second time," nothing in the case authorizes NRL to change its mind after discovering previously unknown facts.

John Karasek intended to deceive by stretching the law in bad faith.  The only possible support for John Karasek's position comes from *In re Maldague*, which further states that "[a] distinction must be made between a mistake in fact, which may form the basis for a holding of unintentional abandonment . . . and the arrival at a different conclusion after reviewing the same facts a second time.")  *In re Maldague*, at 1478.  Giving John Karasek the benefit of the doubt, we assume that he incorrectly read this statement to authorize NRL to change its mind based on a "mistake in fact" if NRL had more than the "same facts" to review the second time.  This is certainly not the law.  *See In re Patent of Carlson*, 2003 WL 25523657 at *6 (Comm'r Pat. Jan. 24, 2003) (discovery of unknown information not "mistake of fact"); *In re Patent No. 5,181,974*, 2007 WL 4974450 at *5 (Comm'r Pat. Aug. 17, 2007) (discovery of unknown information not "mistake of fact").  However, even if we assume that John Karasek interpreted the law this way, the evidence proves that John Karasek knew there was only a "chance" the PTO would accept this position.  Jane Kuhl recalled that, during their first conversation, John Karasek told her,

> something like if we can show that there had been commercial interest but we were unaware of it because of Mr. Reagon's illness--for instance, if Mr. Ansari had left a voice message or attempted to leave a voice message or

send an E-mail to Mr. Reagon who was not responding--that <u>there is a chance</u> that we can say it was, you know, that there was commercial interest, but it just didn't get to our attention because it was a problem in the office.

SOF-101 (emphasis added).  Later, Hazim Ansari similarly acknowledge his belief "that there is a <u>slim chance</u> the '122 Patent could be revived."  SOF-114, Ex. B-8.  Thus, John Karasek deceived the PTO by relying upon an interpretation of the law that he knew the PTO would not likely accept.

## C.  John Karasek Intended to Deceive by Filing a Petition Without Any Evidentiary Support for His Specious "Mistake of Fact" Interpretation.

While John Karasek may have justified to himself that a "mistake of fact" was legally possible, he had no evidence or facts that a "mistake of fact" had occurred.  SOF-96, 97, and 107.  The PTO imposed a duty on John Karasek to disclose his evidentiary support for his "unintentional" statement.

While the Office reserves the authority to require further information concerning the cause of abandonment and delay in filing a petition to revive, the Office relies upon the applicant's duty of candor and good faith and accepts the statement that 'the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137(b) was unintentional' without requiring further information in the vast majority of petitions under 37 CFR 1.137(b).  This is because the applicant is obligated under 37 CFR 10.18 to inquire into the underlying facts and circumstances when a practitioner provides this statement to the Office.  In addition, providing an inappropriate statement in a petition under 37 CFR 1.137(b) to revive an abandoned application may have an adverse effect when attempting to enforce any patent resulting from the application. *See Lumenyte Int'l Corp. v. Cable Lite Corp.*, Nos. 96-1011, 96-1077, 1996 U.S. App. LEXIS 16400, 1996 WL 383927 (Fed. Cir. July 9, 1996)

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982-JVS (RNBx)

(unpublished) (patents held unenforceable due to a finding of inequitable conduct in submitting an inappropriate statement that the abandonment was unintentional).[6]

MPEP § 711.03(c).  Under 37 CFR § 10.18, John Karasek was required to make his "unintentional" statement only upon "knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

John Karasek breached this duty because, when he filed the Petition on May 10, 2004, he had no evidence, much less the required "evidentiary support," that NRL had decided to abandon the '122 Patent without knowing all the facts.  John Karasek made-up a story that he thought would support his specious "mistake of fact" interpretation. Specifically, he told Jane Kuhl,

> something like if we can show that there had been commercial interest but we were unaware of it because of Mr. Reagon's illness--for instance, if Mr. Ansari had left a voice message or attempted to leave a voice message or send an E-mail to Mr. Reagon who was not responding--that there is a chance that we can say it was, you know, that there was commercial interest, but it just didn't get to our attention because it was a problem in the office.

SOF-101 (emphasis added).  Clearly, John Karasek thought Mr. Reagon would make for a believable story because Mr. Reagon was the head of NRL's Technology Transfer Office and he was out of the office for extended periods due to illness.  SOF-102.  On May 11, 2004, John Karasek told Jane Kuhl that NRL had not paid the maintenance fee and that he "knows what kinds of facts they need."  SOF-99.  He told her, "there's a chance we can get it back if there was evidence that there was commercial interest in the

---

[6] The standard for "unintentional" delay is the same under 37 CFR 1.378 as it is for 37 CFR 1.137(b).  MPEP § 2500(II), citing § 711.03(c).

18

patent that had been -- that was unknown." SOF-100. John Karasek told Jane Kuhl to ask Hazim Ansari whether he had tried to contact NRL prior to expiration of the '122 Patent (SOF-101), and suggested that such prior efforts to contact NRL could be a basis for revival. SOF-100. What John Karasek hid from everyone, including the PTO, is that he filed the Petition before Jane Kuhl or Hazim Ansari told him anything about prior efforts to contact NRL. SOF-108.

As of May 11, 2004, Jane Kuhl had said nothing of any prior attempts to contact NRL to John Karasek because Hazim Ansari had provided no such information to her. SOF-54, 55, and 60. John Karasek never spoke directly to Hazim Ansari such that all of his information came through Jane Kuhl. SOF-64, and 89-91. It was not until May 25, 2004 that Jane Kuhl had a discussion with Hazim Ansari "telling him that it was important that we know he had expressed interest in the patent. And that could he recall dates and times and who he tried to—when he tried to contact us and who he tried to contact prior to contacting me on May 10th." SOF-118, 126, and 127. Undoubtedly, John Karasek intended to deceive because, on the day he filed the Petition, John Karasek knew he did not have the required evidentiary support for his made-up story that NRL had decided to abandon the '122 Patent without knowing all the facts.

### D.   John Karasek Deceived the PTO by Failing to Identify the Evidentiary Support He Expected to Have After Reasonable Opportunity for Further Investigation.

Because Jane Kuhl had not yet asked Hazim Ansari whether he had tried to contact NRL prior to expiration of the '122 Patent, Mr. Karasek had no evidentiary support to identify in his Petition to the PTO that was likely to be obtained after reasonable opportunity for further investigation. SOF-108. Under 37 CFR § 10.18, John Karasek was required to either: (1) have evidentiary support for his "unintentional" statement when he signed and filed the Petition; or (2) specifically identify in the Petition to the PTO the evidentiary support he was likely to have after a reasonable opportunity for

STATE FARM'S MSJ MEMORANDUM

19

CASE NO. SACV 11-00982-JVS (RNBx)

further investigation or discovery.  37 CFR § 10.18.  On May 10, 2004 when he filed the Petition, John Karasek could only wish that he would be able to find evidentiary support for his made-up story that NRL had decided to abandon the '122 Patent without knowing that Network Signatures was trying to contact NRL.  Merely wishing that Hazim Ansari had tried to contact NRL prior to expiration of the '122 Patent, John Karasek was unable to satisfy the requirement to identify to the PTO what evidentiary support he was likely to have because he had no idea what Hazim Ansari would say when questioned.  He breached his duty under 37 CFR § 10.18 to identify evidentiary support he expected to discover.  Thus, John Karasek clearly intended to deceive the PTO by failing to admit to the PTO that he possessed no evidentiary support for his made-up story, and that he was unable to identify evidentiary support likely to be discovered because he still had no idea what Hazim Ansari would say once questioned by Jane Kuhl.

**E.     John Karasek Did Not Want Hazim Ansari to Sign A Declaration or Affidavit, Nor Did John Karasek Make Any Attempt to Obtain Corroborating Evidence of Hazim Ansari's Voice Mail or Emails Because He Knew Hazim Ansari's Statements Were Highly Suspect.**

In breach of his duty under 37 CFR § 10.18 to inquire into the underlying facts and circumstances, John Karasek actually avoided collecting evidence.  John Karasek told Jane Kuhl to get "information regarding [Hazim Ansari's] attempts to inform Naval Research Lab of his interest in the ['122 Patent]," (SOF-136), but indicated he "will not need a declaration.  Get signed letter or faxed."  SOF-135.  Hazim Ansari provided a letter dated June 2, 2004, wherein he claimed:  (1) on April 5th, called the NRL Office of Technology Transfer and was transferred to an unknown voice mailbox and left a message; (2) on April 12th, sent an email to techtransfer@nrl.navy.mil, but the email bounced back; and (3) on April 14th, sent another email to techtransfer@nrl.navy.mil, but the email bounced back again.  SOF-121, 122, and 123, Ex. B-9.  Neither Jane Kuhl, John Karasek, nor anyone else at NRL attempted to determine whether evidence existed

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982-JVS (RNBx)

to corroborate Hazim Ansari's description of a voice message or the two emails.  SOF-94, 98, 136, and 137.   John Karasek designed this further breach of duty under 37 CFR § 10.18 to allow Hazim Ansari to provide the evidentiary support John Karasek though he needed to justify the Petition he already filed, without causing Hazim Ansari to perjure himself.

John Karasek's intent to deceive is particularly evident from his certain knowledge that Hazim Ansari had every reason to fabricate his claims of pre-expiration attempts to contact NRL.  Not knowing that John Karasek had already filed the Petition and received an affirmative grant of the Petition from the PTO, Hazim Ansari tried to induce NRL to file a petition to revive the '122 Patent.  SOF-115 and 116.  Jane Kuhl did not tell Hazim Ansari the '122 Patent had expired until May 20, 2004.  SOF-109.  At the time of their conversation on May 20, 2004, neither Hazim Ansari nor Jane Kuhl knew that John Karasek had already filed the Petition with the PTO.[7]  SOF-110.  On May 24, 2004, Hazim Ansari wrote to Jane Kuhl stating that he understood "that the '122 Patent has been officially abandoned," but he further believed "that there is a slim chance the '122 Patent could be revived if the abandonment is immediately addressed."  SOF-112, 113, and 114; Ex. B-8.  Via the same letter, Hazim Ansari tried to induce NRL to provide "a declaration from an individual responsible for the '122 Patent that the failure to pay the maintenance fee was unintentional," in exchange for "15% of all revenue generated from enforcing the patent against infringing parties."  SOF-116, Ex. B-8.  Hazim Ansari was willing to "pay the legal fees and costs associated" with filing a petition even if there was only a "slim chance" of success because he wanted to keep 85% of "all revenue generated from enforcing the patent against infringing parties" for himself.  SOF-116, Ex.

[7] It is reasonable to infer that John Karasek did not tell Jane Kuhl he had already filed the Petition because to do so would cause her to question his basis for the Petition when she had not yet questioned Hazim Ansari as to whether he had attempted to contact NRL before expiration of the '122 Patent.

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982-JVS (RNBx)

B-8.   John Karasek read this letter and therefore knew that Hazim Ansari was highly
motivated to have the '122 Patent revived.  Thus, to maintain the deception without
putting Hazim Ansari at risk of perjury, John Karasek expressly asked for a "signed letter
or fax," but not a "declaration" (SOF-135).

> **F.**     **After John Karasek Obtained Evidentiary Support for His Specious
> "Mistake of Fact" Story, He Chose Not to Disclose the Evidence to the PTO
> and Instead Drafted a Memorandum to His File.**

Two months after filing the Petition with the affirmative statement that "the delay
in payment of the maintenance fee to this patent was unintentional," John Karasek chose
to draft a memorandum to his file rather than advise the PTO as to the evidentiary support
he had obtained for his statement.  SOF-76 and 81.  He knew that if he filed the
evidentiary support contained in his memorandum with the PTO, there was only a
"chance" the PTO would uphold its prior grant of the Petition.  SOF-100, 101, and 114.
Rather than risk the PTO reversing its decision to grant the Petition, John Karasek drafted
a memorandum to his file (SOF-81), which he hoped would justify his Petition if
challenged.  John Karasek's utter failure to provide any of this information to the PTO
throughout this entire process evidences a lack of candor and good faith, such that the
only reasonable inference is that John Karasek intended to deceive the PTO.  *Dura
Operating Corp. v. Magna Int'l*, 2011 WL 869372 at *12 (E.D.Mich. March 10, 2011)
(deceptive intent may reasonably be inferred when a petitioner fails to disclose to the
PTO that a prior decision had been made to abandon the patent and the petitioner alleges
an "unintentional" delay in payment of a maintenance fee).

**IV.    The '122 Patent Must Be Declared Unenforceable To Do Justice To The PTO,
The Patent System, And All Of The 83 Defendants That Have Been Sued By
Network Signatures.**

According to the PTO, the proper remedy for a false petition to revive under 37
CFR 1.378(c) is "an adverse effect when attempting to enforce any patent."  MPEP 700-

144.  The PTO further identifies an unenforceable holding as the proper remedy.  MPEP

700-144.  Patent holders are "put on notice that a statement to the USPTO in the

application for revival which was not in synch with what actually took place would put

him at risk of a later finding of abandonment," such that a court must declare the patent at

issue unenforceable.  *Lawman Armor Corp. v. Simon*, 2005 U.S. Dist. LEXIS 10843 at *6

(E.D. Mich. Mar. 29, 2005).

The defense of inequitable conduct is "equitable in nature and thus does not give

rise to the right of trial by jury."  *Gardco Manuf., Inc. v. Herst Lighting Co.*, 820 F.2d

1209, 1212 (Fed. Cir. 1987).  In *Gardco*, the Federal Circuit affirmed a District Court's

finding inequitable conduct without a jury trial.  *Id.* at 1210.  The Court explained that the

conduct of the patentee in the PTO, at issue in inequitable conduct, is separate and

distinct from the infringement/invalidity issue and without commonality either as claims

or in relation to the underlying fact issues.  *Id.* at 1213.  For the same reason, this Court is

in position to rule on inequitable conduct without waiting for a jury trial.  *Id.*

## V.  CONCLUSION.

The '122 Patent is unenforceable.  The NRL decided not to pay the 7½ year

maintenance fee for the '122 Patent so that it expired on April 23, 2004.  On May 10,

2004, John Karasek filed a Petition to revive the '122 Patent stating that "the delay in

payment of the maintenance fee to this patent was unintentional."  However, that

statement was false as a matter of law.  When John Karasek signed the Petition, he had

no reason to believe that NRL's decision to abandon was based on a "mistake of fact."

Rather, he wished that Hazim Ansari had tried to contact the NRL prior to expiration,

because he wanted to be able to find evidence that would justify his Petition.  To that end,

John Karasek instructed Jane Kuhl to ask Hazim Ansari if he had tried to contact NRL

prior to expiration, and Hazim Ansari happily said that he had tried to contact NRL.

Even if true, NRL's ignorance of Hazim Ansari attempts to contact NRL was not a

"mistake of fact" as a matter of law.  None of this evidence was ever provided to the

PTO, because John Karasek knew that the PTO would likely deny the Petition or reverse its decision to grant the Petition.  The only reasonable inference is that John Karasek intended to deceive the PTO.  The '122 Patent must now be declared unenforceable to ensure that the PTO's policy of reliance on the Petitioner's duty of candor and good faith is not abused.

Dated:  April 16, 2012                    Respectfully submitted,


    _/ s / William Beard_____

STEVEN PARK (State Bar No. 215219)
spark@kslaw.com
KING & SPALDING LLP
333 S. Grand Avenue, Suite 4200
Los Angeles, CA  90071
Telephone:  (213) 867-2655
Facsimile:  (213) 626-2146

R. WILLIAM BEARD, JR. (*pro hac vice*)
wbeard@kslaw.com
KING & SPALDING LLP
401 Congress Avenue, Suite 3200
Austin, TX  78701
Telephone:  (512) 457-2026
Facsimile:  (512) 457-02100
Attorneys for Defendant
STATE   FARM   MUTUAL   AUTOMOBILE
INSURANCE COMPANY

STATE FARM'S MSJ MEMORANDUM

CASE NO. SACV 11-00982-JVS (RNBx)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 16, 2012, a true and correct copy of State Farm Mutual Automobile Insurance Company's Memorandum of Points and Authorities in Support of Motion for Summary Judgment was served on counsel via email, as follows.

Nathaniel L. Dilger (Bar No. 196203)
email: ndilger@onellp.com
Peter R. Afrasiabi (Bar No. 193336)
email: pafrasiabi@onellp.com
**ONE LLP**
4000 MacArthur Boulevard
West Tower, Suite 1100
Newport Beach, California 92660
Telephone:   (949) 502-2870
Facsimile:   (949) 258-5081

Attorneys for Plaintiff,
NETWORK SIGNATURES, INC.


*/ s / William Beard*
R. William Beard, Jr.